IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 00-cv-02325-MSK-MEH

SIERRA CLUB and
MINERAL POLICY CENTER,

    Plaintiffs,

v.

CRIPPLE CREEK AND VICTOR GOLD MINING COMPANY,
ANGLOGOLD ASHANTI (COLORADO) CORPORATION,
ANGLOGOLD ASHANTI NORTH AMERICA, INC., and
GOLDEN CYCLE GOLD CORPORATION,

    Defendants,

and

Civil Action No. 01-cv-02307-MSK-MEH

SIERRA CLUB, and
MINERAL POLICY CENTER,

    Plaintiffs,

v.

CRIPPLE CREEK & VICTOR GOLD MINING COMPANY,
ANGLOGOLD (COLORADO) CORPORATION,
ANGLOGOLD NORTH AMERICA, INC., and
GOLDEN CYCLE GOLD CORPORATION,

    Defendants.

**ORDER GRANTING, IN PART, MOTION FOR ATTORNEY FEES**

THIS MATTER comes before the Court on two post trial motions for attorney fees **(#314, #315)** filed by the Defendants pursuant to 33 U.S.C. § 1365(d), to which the Plaintiffs have responded **(#333)**[1] and to which the Defendants have replied **(#334, #335)**. Also before the Court is the Plaintiffs' Motion to Strike Defendants' Evidence Under Fed. R. Evid. 408, Fed. R. Evid. 801, and Fed. R. Civ. P. 68 **(#332)**, to which the Defendants have responded **(#336, #337)** and to which the Plaintiffs have replied **(#338)**. Having considered the same, the Court finds and concludes as follows.

### I. Jurisdiction

The Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

### II. Factual Background

In 2000 and 2001, the Sierra Club and the Mineral Policy Center initiated two actions[2] pursuant to the citizen suit provisions of the Clean Water Act (33 U.S.C. § 1251, *et seq)* against AngloGold (Colorado) Corporation ("AngloGold Colorado"), AngloGold Ashanti North America ("AngloGold N.A."), Golden Cycle Gold Corporation ("GCG Corporation"), and the Cripple Creek & Victor Gold Mining Company ("CC&V").[3] CC&V is a joint venture of AngloGold Colorado and GCG Corporation.

---

[1] The Plaintiffs filed a consolidated response to both motions. Defendant Golden Cycle Gold Corporation characterizes the filing of a single response as an attempt to improperly group it with the other Defendants. However, it was the Court which ordered a single, consolidated response to both motions for attorney fees **(#325)**.

[2] Civil Action No. 00-cv-02325-MSK-MEH was commenced on November 27, 2000, and Civil Action No. 01-cv-02307-MSK-MEH was commenced on November 30, 2001. Upon the Plaintiffs' motion, the Court consolidated both actions for purposes of trial on August 18, 2004.

[3] To the extent practicable, the Court refers to each party by name. Otherwise, they are referred to collectively as "the Plaintiffs" or "the Defendants."

The Plaintiffs claimed that the Defendants' gold and silver mining activities in the Cripple Creek Mining District in Teller County, Colorado, resulted in water pollution of nearby streams and creeks. In these actions, the Plaintiffs asserted two types of claims: (1) the Defendants violated the terms of the National Pollutant Discharge Elimination System ("NPDES") discharge permits that had been issued for Carlton Tunnel and Arequa Gulch; and (2) the Defendants discharged pollutants from other point sources without a permit. The Plaintiffs sought a monetary penalty which, if awarded, would have been payable to the United States Treasury.

After the Plaintiffs commenced this lawsuit, the Environmental Protection Agency ("EPA") and the Colorado Water Quality Control Division ("WQCD") initiated two administrative enforcement actions to address all existing violations. The action initiated by the EPA resulted in a settlement agreement imposing the maximum penalty of $125,000 against the Defendants. The action initiated by the WQCD also resulted in a settlement agreement and the issuance of an injunction that required the Defendants to comply with the Clean Water Act[4] and permits issued thereunder.

In the older of the two civil actions, the Defendants moved for summary judgment, arguing that the outcome of the administrative enforcement actions barred the Plaintiffs from pursuing similar claims in this Court.[5] In ruling upon the Defendants' summary judgment motions in March 2004 **(#164)**, the Court recognized the overlap between the claims resolved in the administrative enforcement proceedings and the claims asserted in this matter. The Court concluded that the Plaintiffs could proceed on their claims in this matter despite the administrative

---

[4] This included obligations to monitor the impact of the mine on the water flow in the Roosevelt Tunnel, and to apply for a discharge permit for water seeps located at the Carlton Tunnel ponds

[5] The Defendants argued for application of the doctrine of *res judicata*.

proceedings because: (1) the Clean Water Act authorizes a citizen action, such as this, if it is brought before the administrative proceeding begins; and (2) the monetary penalty that theoretically could be obtained in a citizen action is greater than the maximum penalty in an administrative action. Despite allowing the Plaintiffs to proceed in this matter, the Court's ruling implicitly recognized that the outcome of the administrative proceedings significantly narrowed the scope of the dispute and the recovery which the Plaintiffs could obtain.

Discovery in this case proceeded for a very long time. At the close of the discovery period, the Plaintiffs advised the Court that the discovery they had conducted pertained only to liability, not to the issues of whether and how great a penalty should be imposed. As a consequence, trial in this matter was bifurcated, with the first trial to address liability, and, if necessary, another to address the imposition of a penalty.

Prior to the liability trial, the Court resolved several challenges to the opinions of the Plaintiffs' experts pursuant to Fed. R. Evid. 702. Due to the Plaintiffs' failure to establish the prerequisites for admission of expert opinions under Fed. R. Evid. 702, the Court excluded certain opinions – as to a hydrological connection between point sources and Cripple Creek and Four Mile Creek, as to the source of alleged pollutants, and as to whether there was a likelihood of future Clean Water Act violations from various point sources.[6]

---

[6] Hearings were held on June 3, August 24, September 27, October 27 and October 28, 2005. The Court's rulings on the Rule 702 ch ( # 262). Challenges were made orally on June 3 and August 24, 2005, and in writing on November 16, 2005The Court excluded opinions by Kenneth Klco that there was a hydrological connection between the El Paso mine, mine shaft, mine property, and underground workings and Cripple Creek, as well as opinions as to the potential sources of pollutants, because he did not base them upon a reliable methodology and, as to two opinions, because he was not qualified to render them. The Court excluded opinions by Ann Maest as to hydrological connections between the Moffat Tunnel cribbing wall and Cripple Creek, between the mine and Cripple Creek, and between the Carlton Tunnel ponds and Four Mile Creek, as well as opinions regarding the source of constituents in the water, because the Plaintiffs failed to establish that the opinions were derived by use of any reliable methodology. The

The liability issues were then tried to the Court over seven days. As to each claim, the Plaintiffs were required to prove that, at the time they had commenced their civil actions, the Clean Water Act violations were ongoing or likely to recur.[7] To prove their claims that the Defendants discharged pollutants without a permit, the Plaintiffs were also required to demonstrate that there was: (1) a discharge (2) of a pollutant (3) into navigable waters (4) from a point source (5) without a permit. After considering all of the evidence presented, the Court found that the Plaintiffs had failed to prove essential elements of their claims. It therefore entered judgment in favor of the Defendants **(#309, #310)**.[8]

With regard to the claims for violation of permit limits, the Court found that the Plaintiffs failed to establish any ongoing violation. *See* note 7, *supra*. The limits of two permits were at issue – the Carlton Tunnel Permit and the Arequa Gulch Permit, the latter of which was modified by an order of the Teller County District Court referred to as the Teller County District Court Stay Order.[9] As to the Carlton Tunnel Permit, there was no evidence of flow or zinc exceedances for approximately 17 months prior to the filing of the Complaint, and no evidence of any exceedance of the limit for total suspended solids ( TSS) for 4 ½ years prior to the filing of the Complaint. The only evidence of exceedances revealed them to be minor and infrequent. In

---

Court issued a written ruling which excluded opinions by Robert Burm as to whether there were ongoing violations at several point sources, because they were not premised upon any reliable methodology.

[7] This is referred to as an "ongoing violation." There is an "ongoing violation" when the violation is occurring at the time the claim is asserted, or when there is a continuing likelihood of a recurrence of intermittent or sporadic violations after the claim is asserted.

[8] The Court also concluded that the Mineral Policy Center lacked standing to assert any claims. Such conclusion, however, has no bearing on the motions for attorney fees, because the Sierra Club did have standing and the matter would have gone forward, regardless.

[9] This Order stayed various effluent limits in the original permit and set new limits.

response to such exceedances, CC&V implemented successful remedial measures that prevented additional violations.[10] With regard to the Arequa Gulch Permit, there was evidence of sporadic, minor violations during 1998 and 1999 of the cyanide effluent limits in the Teller County District Court's Stay Order and a single WET test failure in 1996. Before the first Complaint was filed in November 2000, CC&V had implemented successful remedial measures that prevented further exceedances. The WET test never resulted in a pattern of toxicity.

With regard to claims that the Defendants discharged pollutants without a permit, the Plaintiffs assumed, but offered no evidence, that the constituents found in water samples were pollutants[11] and that the water collected came from a particular source. The alleged pollutants were metals (iron, zinc, aluminum, cobalt, manganese, cadmium, and copper) and arsenic found in various water samples. The Plaintiffs presented no evidence that any human action, as distinguished from a natural occurrence, caused the substances to be present in the water. In addition, as to three of the alleged point sources, the Plaintiffs failed to present any evidence as to the source of the water sampled.

### III. Issues Presented

The first motion for attorney fees is brought by Defendants CC&V, AngloGold Colorado,

---

[10] Indeed, the only violation of the Carlton Tunnel Permit that recurred was an initial Whole Effluent Toxicity (WET) test failure. This never matured into a pattern of toxicity, and thus did not constitute a violation of the permit. As explained more fully in the Memorandum Opinion and Order **(#309)**, WET testing involves the analysis of a water sample for a biological response. Analysts look at the survival rate of the species *Ceriodaphnia dubia* in the water to determine the water's degree of toxicity. If the toxicity reaches a certain level, there is a WET test failure. A single WET test failure is not dispositive of a pattern of toxicity but merely triggers a requirement to perform additional tests.

[11] The term "pollutant" is defined by the Clean Water Act at 33 U.S.C. § 1362(12). In the Memorandum Opinion and Order, the Court explained that for a substance to be a "pollutant," it must be present as the result of human action, rather than something which occurs naturally.

and AngloGold N.A. (collectively, "the AngloGold Defendants"). Pursuant to 33 U.S.C. § 1365(d), they request an award of attorney fees, expert witness fees, and litigation expenses totaling $1,436,497.01. They contend that "the Plaintiffs' claims lacked merit from the outset, and the Plaintiffs continued to pursue them in bad faith even as it became increasingly clear that they were groundless."

The second motion is brought by Defendant GCG Corporation. Pursuant to 33 U.S.C. § 1365(d), GCG Corporation seeks attorney fees of $130,975.60,[12] which sum includes $1,391.60 in costs. GCG Corporation adopts the arguments of the AngloGold Defendants, except it does not seek expert witness fees. Defendant GCG Corporation also argues that the Plaintiffs acted in bad faith by pursuing claims against it when they offered no evidence at trial to implicate it.

The Plaintiffs object to any award of fees and costs. They contend that they did not commence this litigation for an improper purpose, there was an evidentiary basis for all of their contentions, they proceeded in good faith, the Court's ruling concerned novel issues, and an award of fees and costs would be inequitable. They also argue that, if attorney fees are awarded, the amount of fees should be reduced in accordance with their specific challenges to particular entries.[13] They further contest any award of fees for six defense experts.[14] The Plaintiffs do not contend, however, that the hourly rates charged or the time spent by the Defendants' attorneys is

---

[12] Defendant GCG Corporation states, however, that it actually paid only $118,841.50 in attorney fees.

[13] They contend that no fees should be awarded for: (1) imprecise, vague or excessive billing entries; (2) unsuccessful motions; (3) time spent on regulatory matters; (4) time spent on other cases; (5) time spent on clerical matters; (6) time spent on press issues; and (7) fees for experts who did not testify at trial.

[14] Such experts are Adrian Brown, Gary Thompson, Gary Lacy, Fred Banta, John Christy, and Kevin Conroy.

unreasonable.

The motions present two distinct issues – whether the Defendants should be awarded attorney fees, expert fees, or other litigation expenses, and, if so, what award of fees and expenses is appropriate.

### IV.  Analysis

#### A.  The Clean Water Act

Enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," the Clean Water Act prohibits unpermitted discharges of pollutants into navigable waters of the United States.  33 U.S.C. §§ 1251 & 1311(a).  It authorizes citizens and citizen groups to commence civil actions to enforce the Act's prohibitions.  *See* 33 U.S.C. § 1365(a)(1).  In this regard, the Act allows citizens to serve the public as private attorneys general when there are violations of environmental laws which the government neglects to address.  *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60-62 (1987).  A citizen who commences a suit under these provisions cannot personally obtain any monetary relief; instead, any penalty is paid to the United States Treasury.  *See Friends of the Earth, Inc. v. Laidlaw Environmental,* 528 U.S. 167, 175 (2000).

The same statute that authorizes citizen suits also allows the prevailing party to recover reasonable attorney and expert witness fees, and litigation costs.  *See* 33 U.S.C. § 1365(d).  This statute provides:

> (d) Litigation costs
> The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate. . . .

8

This provision makes no distinction between plaintiffs and defendants. Instead, it provides for an award of fees and costs, when appropriate, to the prevailing or substantially prevailing party. However, case law requires that in applying this section, the Court must evaluate different considerations based on the identity of the prevailing party.

When a plaintiff prevails, the section is liberally construed and fees are typically awarded. *See Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 416-17 (1978) (comparing fee-shifting provision in Title VII of the Civil Rights Act of 1964 with other fee-shifting statutes); *Browder v. City of Moab,* 427 F.3d 717, 721 (10th Cir. 2005). This is because "the plaintiff is the chosen instrument of Congress to vindicate a policy that Congress considered of the highest priority," and when the plaintiff prevails, he or she has proven that the defendant is a "violator of federal law." *See Christiansburg Garment Co.,* 434 U.S. at 418.

However, when a defendant prevails, different equitable considerations determine whether a fee award is appropriate. *See id.* at 418-19. Fees cannot be awarded simply because the plaintiff lost at trial. Otherwise, plaintiffs with legitimate, but not airtight, claims would be discouraged from pursuing such claims. This is of particular concern with regard to Clean Water Act citizen suits, because the citizen-plaintiff seeks no monetary relief for itself and instead acts to protect the public interest. Therefore, to obtain an award of fees, a prevailing defendant must show that the civil action was "frivolous, unreasonable, or without foundation," or that the plaintiff continued to litigate "after it clearly became so." *See id.* at 419-22; *see also Browder*, 427 F.3d at 723.[15]

---

[15] A plaintiff's subjective bad faith is not the determinative factor, but if bad faith is present, there might be a stronger basis to support an award of fees. *See Christiansburg Garment Co.*, 434 U.S. at 701.

**B. Is an Award of Fees and Expenses Appropriate?**

The Defendants have argued that an award of fees and expenses is justified because the Plaintiffs acted in bad faith by initiating and pursuing this matter. The Court declines to make any award based upon alleged bad faith in the commencement of the cases for many reasons.

First, the Court observes that although some case law refers to "bad faith", the standard for review is whether the asserted claims were frivolous, unreasonable, or without foundation when asserted. The Defendants' argument that Plaintiffs' claims were asserted for an improper purpose actually amounts to a request for sanctions under Fed. R. Civ. P. 11(c), premised upon a violation of Rule 11(b)(1). Before such request can be made, the Defendants must have complied with the safe harbor provisions of Rule 11(c)(1)(A). The Defendants have made no demonstration that they have complied with such provisions by serving a motion for Rule 11 sanctions on the Plaintiffs at least 21 days before filing the motion. Now that the case has been tried and judgment entered, the Defendants cannot timely comply with such provisions.[16]

Second, there is no showing that the claims were unfounded when asserted. As noted in the March 2004 summary judgment ruling, this matter was properly commenced as a citizen action prior to initiation of the administrative enforcement actions. There had been past permit exceedances of both the Carlton Tunnel Permit and the Arequa Gulch Permit. The Plaintiffs' belief that there were ongoing violations, although later demonstrated to be factually unsupported, was not out of line considering the past violations. When the complaints in this matter were filed: (1) the Plaintiffs had not conducted an examination of the Defendants' land or any tests of the

---

[16] Thus, the Court disregards any evidence of settlement negotiations offered to establish that the actions were commenced or pursued for an improper purpose. Consequently, the Court denies, as moot, the Plaintiffs' motion **(#332)** to strike the exhibits offered by the AngloGold Defendants.

suspected discharges or exceedances; and (2) no administrative enforcement actions were pending. Indeed, early in the litigation, the Plaintiffs filed motions seeking leave of the Court to serve Fed. R. Civ. P. 34 requests on the Defendants so that they could enter onto the Defendants' lands to conduct an examination and testing. Both motions were granted over the Defendants' opposition. This allowed the Plaintiffs to fully investigate their claims.

However, although the claims may have been justified at their inception, the subsequent development of the case brought the claims to a point where they were clearly without foundation. During the litigation, the controversy became narrower as the result of the administrative enforcement actions. As noted in the Court's March 2004 ruling on the Defendants' summary judgment motions, the settlement agreements from the administrative enforcement actions afforded much of the relief that was originally sought in this matter. The Defendants paid the civil penalty of $125,000 for past violations; if there were any civil penalty awarded in this case, it would be reduced by such amount. In addition, the WQCD proceedings resulted in a prospective injunction which required the Defendants to comply with the Clean Water Act. As a result, the matters at issue for trial were greatly reduced compared to that raised in the original complaints.

In addition, by virtue of the Court's rulings on the Plaintiffs' proffered expert opinions, the Plaintiffs should have known that they had no evidentiary support to establish either an ongoing violation of the existing permits, and as to the unpermitted discharges, that they had no evidence to establish the source of the water samples or their constituents. It might have been possible to plug these holes with other evidence, but the Plaintiffs never sought to do so. They did not seek to supplement the opinions, seek reconsideration, seek to reopen discovery or otherwise obtain evidence sufficient to prove these essential elements of their claims. In the absence of evidence

essential to their claims, the Plaintiffs could have dismissed them, sought an interlocutory appeal, or entered into a stipulated judgment, reserving the right to appeal the Court's Rule 702 determinations. Instead, the Plaintiffs proceeded to trial without evidence to establish essential elements of their claims.

In the absence of adequate evidence to present a *prima facie* case, and with no attempt to obtain such evidence, the Court finds that the Plaintiffs' decision to continue pursuing their claims after November 16, 2005, was unreasonable. Their dogged pursuit of factually unsupported claims is exactly the situation that the attorney fee provision in the Clean Water Act is designed to address. An award of reasonable fees and expenses is appropriate, but it is limited to those fees and expenses which arose after November 16, 2005.

**C. Lodestar Analysis**

In determining the appropriate amount of fees and costs to award under 33 U.S.C. § 1365(d), the Court employs a lodestar analysis. This analysis is premised upon the multiplication of the number of hours reasonably expended by counsel by a reasonable hourly rate. *See City of Burlington v. Dague*, 505 U.S. 557, 562 (1992). This sum is presumed to result in a reasonable fee. *Id.*[17] This sum can then be adjusted in light of the specifics of the case. *See Delaware Valley Citizens Council for Clean Air*, 478 U.S. at 564-65. To do so, the Court considers the factors identified by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974). *See Homeward Bound, Inc. v. Hissom Memorial Center*, 963 F.2d 1352, 1356 (10th Cir. 1992). These factors are: (1) the time and labor required; (2) the

---

[17] Attorney fees may be awarded not only for the work of attorneys but also for support staff when such work contributes to the work product of an attorney. *See Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285 (1989).

novelty and difficulty of the questions presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for the services; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client; (8) the amount involved and the results obtained; (9) the attorney's experience, reputation and ability; (10) whether the case was desirable; (11) the nature and length of the attorney's relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

In determining the reasonableness of the hours expended, the Court considers several factors, including: (1) whether the amount of time spent on a particular task appears reasonable in light of the complexity of the case, the strategies pursued, and the responses necessitated by an opponent's maneuvering; (2) whether the amount of time spent is reasonable in relation to counsel's experience; and (3) whether the billing entries are sufficiently detailed, showing how much time was allotted to specific task. *See Ramos v. Lamm*, 713 F.2d 546, 553-54 (10th Cir. 1983), *rev'd in part on other grounds*, *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 483 U.S. 711 (1987).[18]

In this case, the Court considers only the fees and expenses incurred by defense counsel after November 16, 2005. As to these, the Plaintiffs have objected to only a handful of specific entries in the billing statements submitted by the AngloGold Defendants for attorney Eugene Riordan. They make no objection to the billing entries of attorney Robert Troyer, or to those of attorney Don Sherwood.

With regard to the AngloGold Defendants, the Court has reviewed the billing statements

---

[18] The Tenth Circuit's decision in *Ramos* highlights other factors, such as whether the fees pertain to tasks that would ordinarily be billed to a client, and whether multiple attorneys have charged for duplicative tasks which a single attorney could have performed. In the case at bar, the Plaintiffs do not contend that either of these factors are pertinent.

from November 2005 through March 2006. The Court agrees with the Plaintiffs that the following billing entries for attorney Eugene Riordan are vague, and therefore excludes the charges:

| Date | Hours | Amount |
| --- | --- | --- |
| 11/17/05 | .25 | $52.50 |
| 12/11/05 | 1.40 | $294.00 |
| 1/10/06 | .40 | $90.00 |
| 1/23/06 | 7.15 | $1,608.75 |
| 1/26/06 | 1.55 | $348.75 |
| 2/1/06 | 11.10 | $2,497.50 |

The Court also agrees that the following billing entries appear to be unrelated to this matter and therefore excludes the charges:

| Date | Hours | Amount |
| --- | --- | --- |
| 12/7/05 | 5.75 | $1,207.50 |
| 1/5/06 | 3.45 | $776.25 |
| 1/21/06 | .65 | $146.25 |
| 1/25/06 | 5.75 | $1,293.75 |
| 1/30/06 | 7.65 | $1,721.25 |

However, there is no objection to the other entries on Mr. Riordan's bills which entries appear reasonable on their face. Therefore, the Court finds that 425 hours billed by Mr. Riordan reflect reasonable and necessary services performed after November 16, 2005.

The Plaintiffs object to no specific entries in the bills of attorney Robert Troyer and his staff. Even though there was no objection, the Court excludes charges for the following entry as insufficiently detailed.

14

| Date | Hours | Amount |
|---|---|---|
| 2/7/06 | 0.75 | $356.25 |

The Court finds that all other charges incurred after November 16, 2005 (430.75 hours of work performed by Mr. Troyer, 63.25 hours of work performed by attorney D. Bliss, and 3.50 hours of work performed by support staff C. Cooper[19]), are reasonable and necessary.

The Plaintiffs make no specific challenges to the billing entries for attorney Don Sherwood. These statements are sufficiently detailed and reflect reasonably incurred charges. Therefore, the Court finds that the 111.10 hours of services reflected in Mr. Sherwood's billing statements for work performed after November 16, 2005, were reasonable and necessary.

There is no challenge to the reasonableness of any hourly rate. Applying the hourly rate to the charges reasonably incurred, the Court calculates the following lodestar amounts:

| Attorney | Hours | Rate | Lodestar |
|---|---|---|---|
| Eugene Riordan | 425.00 | $210/hour | $95,625.00 |
| Robert Troyer | 430.75 | $425/hour | $183,068.75 |
| D. Bliss | 63.25 | $270/hour | $17,077.50 |
| C. Cooper | 3.50 | $155/hour | $542.50 |
| Don Sherwood | 111.10 | $255/hour | $28,330.50 |
| **TOTAL** | | | **$324,644.25** |

No party has expressly requested either an upward or downward adjustment of this calculation. Nevertheless, the Court considers the *Johnson* factors.

At the time of trial, this matter had been pending for roughly half a decade. Because the

---

[19] D. Bliss worked for Robert Troyer's firm and performed research tasks during and following the trial. C. Cooper also worked for Robert Troyer's firm as support staff and performed only a single compensable task on 12/8/05.

15

matter went to trial, the Defendants needed counsel experienced in the substantive legal area and in trial work. They were represented by counsel with both types of expertise and paid them on an hourly basis. During the trial, the parties raised several legal issues for which there was no binding precedent and which required immediate research and resolution. The stakes in the first trial were great - had the Plaintiffs prevailed, they requested more than $1,000,000 in penalties.[20]

Upon consideration of these factors, and given the amount at stake in the litigation, the Court concludes that no adjustment is required to the lodestar calculation. Accordingly, the Court awards attorney fees totaling $324,644.25 to the Defendants.

**D. Expenses and Expert Fees**

Per the stipulation of the parties, the Clerk of Court awarded costs to the AngloGold Defendants in the amount of $29,000. It is not clear whether a further award of expenses would duplicate those which have already been awarded. Therefore, the Court declines to award any further expenses to the AngloGold Defendants.

Defendant GCG Corporation has requested $1,391.60 in litigation expenses, but has provided no itemization of these expenses that demonstrates what they were for or when they were incurred. Therefore, the Court declines to award it these expenses.

The Defendants did not call any experts to testify at trial. Therefore, the Court cannot find that any expert witness fees were reasonably incurred after November 16, 2005. Moreover,

---

[20] The parties' filings do not address all of the *Johnson* factors. By way of affidavit, Mr. Troyer states that the fees he charged in this case were at the same rates he customarily charges other clients. However, there is no indication in the parties' filings regarding whether the Defendants imposed particular time limitations on their attorneys, whether defense counsel turned away other employment, or whether the case was desirable. The Court is also unable to discern the nature and length of the defense counsel's relationship with the Defendants, or what fee awards have been made to prevailing defendants in similar cases.

the documentation submitted by the AngloGold Defendants in support of an award of expert fees is insufficiently detailed. Consequently, the Court declines to award the Defendants any expert witness fees.

**IT IS THEREFORE ORDERED** that:

(1) The Defendants' motions for attorney fees **(#314, #315)** are **GRANTED**, in part, and **DENIED**, in part.

(2) On or before January 31, 2007, the Plaintiffs shall pay $296,313.75 to the AngloGold Defendants, and $28,330.50 to GCG Corporation, and shall file a certificate with the Court demonstrating such payment. Failure to pay these sums in the time allotted will result in the entry of a judgment in favor of the respective Defendant against the Plaintiffs, jointly and severally.

(3) The Plaintiffs' motion to strike **(#332)** is **DENIED**, as moot.

(4) The parties shall each bear their own attorney fees and costs incurred with respect to the Defendants' motions for attorney fees.

Dated this 20th day of December, 2006

**BY THE COURT:**

_____

Marcia S. Krieger
United States District Judge

17